**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re FLONASE ANTITRUST | : | |
| LITIGATION | : | CIVIL ACTIONS |
| | : | |
| THIS DOCUMENT | : | No. 08-CV-3149 |
| RELATES TO: | : | No. 08-CV-3301 |
| | : | |
| Indirect and Direct Purchaser | : | |
| Actions | : | |

**July __2__, 2012**                                                        **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

## I.  INTRODUCTION

Direct and Indirect Purchasers of a steroid nasal spray containing the active ingredient

fluticasone propionate ("FP"), along with a generic FP manufacturer, have brought actions

against Defendant SmithKline Beecham Corporation, doing business as GlaxoSmithKline PLC

("GSK"), the manufacturer of the branded version of FP ("Flonase"), alleging various violations

arising from GSK's conduct delaying market entry of generic FP.  Currently before me is a

dispute between Direct Purchasers and GSK concerning whether attorney-client privilege

attaches to the communications involving GSK and independent consultant Swiftwater Group

L.L.C. ("Swiftwater").[1]  I initially referred this matter to a Special Master to render an advisory

Decision and Recommendation on whether privilege attached to the communications involving

---

[1] Only Direct Purchasers filed an opposition to GSK's motion for *de novo* review.  Indirect
Purchasers later joined their objection.  For the purposes of brevity, I will only refer to Direct
Purchasers in this opinion.

1

GSK and Swiftwater ("Swiftwater Documents").  On December 13, 2011, the Special Master

issued a Decision and Recommendation finding, as a matter of law, that the Swiftwater

Documents were not privileged.

In response to the Special Master's Decision and Recommendation, GSK filed a motion

for *de novo* review of the Special Master's finding that the Swiftwater Documents were not

privileged.  On May 2, 2012, I held a hearing on GSK's motion.  Following the hearing, I issued

an order granting GSK's motion for *de novo* review to the extent that otherwise privileged

communications between GSK and Swiftwater do not lose their privileged status simply by

having Swiftwater included in them.  *See* No. 08-3149, ECF No. 333; No. 08-3301, ECF No.

421.  Based on this conclusion, I ordered an *in camera* review of the Swiftwater Documents that

Direct Purchasers believe GSK incorrectly claims are privileged.  I referred this task to

Magistrate Judge Strawbridge for a Report and Recommendation as to which documents should

be entitled to privilege.  The opinion that follows explains why the Swiftwater Documents do not

lose their privileged status solely because Swiftwater is an independent consultant.

## II.  BACKGROUND

Swiftwater is a national consulting firm that provides pharmaceutical consulting services,

as an independent contractor, to large multi-national corporations like GSK.  On July 1, 1999,

GSK and Swiftwater began a Master Consulting and Service Agreement ("Master Agreement").

Def.'s Mot. App. II, C2.  According to the Master Agreement, Swiftwater was to provide

consulting services that included, but were not limited to, "advice, analysis, management,

technical or operational support or software programming."  *Id.* at ¶ 1.  The Master Agreement

characterized Swiftwater's role as an "independent contractor" and "not as [GSK's] . . . agent or

employee," and further stated that Swiftwater had "no authority to make any statement,

representation, or commitment . . . binding upon [GSK]" without GSK's authorization.  *Id*. at ¶ 13.  Additionally, the Master Agreement required confidentiality as to "any and all information provided" relating to Swiftwater's services.  *Id*. at ¶ 7.

In 2001, GSK formed a Flonase brand maturation team to assist the corporation as the Flonase brand matured.  From its inception, Swiftwater was involved with the Flonase brand maturation team.  Def.'s Mot. App. I, B2 at Attach A ¶ A.1.  Swiftwater's involvement with the Flonase brand maturation team was defined by a series of engagement letters and work agreements. Def.'s Mot. App. I.  The Flonase brand maturation team was expected to "help generate the development of the [maturation] plan by establishing and then prioritizing a comprehensive set of strategic options."  Def.'s Mot. App. I, B2 at Attach. A ¶ A.1.  Swiftwater "was secured . . . to coordinate this cross-functional matrix team, [and to] help provide additional administrative support to bring these various elements together."   Pls.' Mot. Ex. 3 at 64.  As understood by Associate General Counsel for GSK, Swiftwater's role was to "support . . . the brand maturation team," "[a]nd to do the kinds of things consultants do well, organize and compile ideas and catalyze people to work well together and so on."  Def.'s Mot. App. III, E.

Specifically, during the initial stage of the Flonase brand maturation plan, Swiftwater's role was "to work with . . . the core-team to determine the necessary work streams for the creation of the Brand Maturation Plan," and to "help create and integrate the project plans necessary to build the strategy."  Def.'s Mot. App. I, B2 at Attach. A ¶ A.1.  To do this, Swiftwater would be "drawing on [its] experience in [its] work with Zantac and Ceftin in helping to guide the expanse of strategic options to consider and in developing the plans to determine the viability and or effectiveness of each option."  *Id.*

3

As the Flonase brand maturation project progressed, Swiftwater entered into a new work agreement with GSK "to serve in project management and analytical service roles to help the Flonase Brand team guide and create recommendations for Flonase Brand Maturation Strategy." Def.'s Mot. App. I, B3 at Attach. A ¶ A.1.  As part of this work agreement, Swiftwater agreed to provide: a white paper summarizing its analysis and recommendations for brand maturation strategy, an executive summary presentation of the brand maturation plan, interim presentations, and scenarios in financial models  to support its recommendations.  *Id*.

By October 2001, three work streams had been identified to develop the Flonase brand maturation strategy: legal and regulatory, business development, and standard business practices. Def.'s Mot. App. I, A2 and C2.  Swiftwater contributed to the development and analysis of all three work streams.  Def.'s Mot. App. I, A2, C2, and B4.

According to an "integrated action plan," Swiftwater and the Flonase brand maturation team evaluated possible projects that touched on legal and regulatory advice such as:

- Assessment and assertion of GSK's patent and other intellectual property rights with respect to Flonase. (Integrated Action Plan, App. III, Tab A, at GSK-FLON-1913438).

- Application for and receipt of "pediatric exclusivity" period for Flonase . . . . (*Id.* at GSK-FLON-1913439).

- Application to FDA seeking permission to market over-the-counter Flonase. (*Id*. at GSK-FLON-1913437).

- Submission of comments to FDA's Draft Guidance to ensure consistent and fair standards for bioequivalence in nasal spray products. (*Id.* at GSK-FLON-1913440).

- Application to FDA for permission to market line extensions for Flonase, such as a fragrance-free or double-strength version. (*Id.* at GSK-FLON-1913440).

Def.'s Mot. at 3-4 (citing Def.'s Mot. App. III, A).

4

Thus, Swiftwater played a role in the creation, development, and implementation of the Flonase brand maturation plan, which required Swiftwater not only to engage in administrative tasks and business strategy, but also to delve into the legal and regulatory issues associated with the brand maturation of Flonase.  Def.'s Mot. App. I.

## III.  DISCUSSION

Both parties agree that the attorney-client privilege may attach to the Swiftwater Documents if Swiftwater operated as the "functional equivalent" of a GSK employee.[2]  Thus, the only issue is whether, as a matter of law, Swiftwater was the functional equivalent of a GSK employee.  GSK argues that Swiftwater was the functional equivalent of an employee because Swiftwater was an integrated member of the brand maturation team that was responsible for creating a brand maturation plan, which included numerous regulatory and legal strategies.  Additionally, GSK notes that Swiftwater was subject to the same confidentiality provisions as its employees, and that the expectation was the attorney-client privilege would apply to the Swiftwater Documents.  Direct Purchasers contend that Swiftwater was not the functional equivalent of an employee because Swiftwater played only an administrative role that was not related to actual or anticipated litigation, possessed no specialized knowledge related to Flonase or the FDA regulatory process, had no ability to bind GSK, and was not necessary to GSK because GSK had the internal resources and personnel to perform Swiftwater's functions.

---

[2] The Third Circuit has not yet had the opportunity to address whether a functional equivalent test governs the determination of whether attorney-client privilege may attach to corporate documents involving communications with independent contractors.  However, both parties agree that determination of whether Swiftwater is the functional equivalent of an employee is essential to the attorney-client privilege dispute in this case.  Moreover, the appellate courts that have considered this issue have applied a functional equivalent test.  *See United States v. Graf*, 610 F.3d 1148, 1158-59 (9th Cir. 2010); *Fed. Trade Comm'n v. GlaxoSmithKline*, 294 F.3d 141, 147-48 (D.C. Cir. 2002); *In re Bieter Co.*, 16 F.3d 929, 936-38 (8th Cir. 1994); *see also Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 491-92 (2000).

In *Upjohn Company v. United States*, 449 U.S. 383 (1981), the Supreme Court addressed the scope of the attorney-client privilege in the corporate context.  The issue presented to the Court was whether attorney-client privilege attached to communications involving counsel and non-management-level employees.  *Upjohn*, 449 U.S. at 386-89.  The court below had held that only communications involving corporate employees within the control group were entitled to attorney-client privilege.  *Id.* at 388-89.  The control group was defined as "officers and agents . . . responsible for directing [the company's] actions in response to legal advice . . . ."  *Id.* at 391 (alteration in original) (internal quotation marks omitted).  The Supreme Court rejected the control group test adopted by the court below because it "frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation."  *Id.* at 392.

The Court defined the purpose of the attorney-client privilege "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Id.* at 389.  Moreover, it explained that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Id.* at 390.  Thus, the Court recognized that "[i]n the corporate context . . . it will frequently be employees beyond the control group . . . who will possess the information needed by the corporation's lawyers."  *Id.* at 391.

Beyond providing legal advice on a specific problem, the Court acknowledged the valuable role of corporate counsel "to ensure their client's compliance with the law."  *Id.* at 392.  Accordingly, the Court noted: "In light of the vast and complicated array of regulatory

legislation confronting the modern corporation, corporations, unlike most individuals, constantly go to lawyers to find out how to obey the law . . . ."  *Id.* (internal quotation marks omitted).

Given the underlying purpose of the privilege to provide sound legal advice, the Court held that whether the attorney-client privilege applies shall be determined on a case-by-case basis, looking at the reasons for the communication, rather than the status of the employee.  *Id.* at 394-96. Thus, the Court adopted a functional approach to attorney-client privilege that examined whether the communications at issue were made by employees with relevant information that was necessary to secure legal advice.  *Id.* at 394-95.

Although *Upjohn* addressed whether the attorney-client privilege may apply to corporate communications involving lower-level employees, it did not address whether the attorney-client privilege may apply to communications involving independent consultants of a corporation.

In *In re Bieter Company*, 16 F.3d 929 (8th Cir. 1994), the Eighth Circuit was the first appellate court to address whether communications between counsel and a corporation's independent consultant may fall within the scope of the attorney-client privilege.  An examination of the purpose of privilege set forth in *Upjohn* led the Eighth Circuit to "believe that when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors."  *Id.* at 937.   The Eighth Circuit concluded that "just as [m]iddle-level-and indeed lower-level-employees . . . would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to . . . actual or potential difficulties, so too would nonemployees who possess a significant relationship to the [client] and the [client]'s involvement in the transaction that is the subject of legal services."  *Id.* at 938 (alteration in original) (citation omitted) (internal quotation marks

omitted).  Based on this reasoning, and the principles established in *Upjohn*, the *Bieter* Court

adopted the approach that communications involving counsel and an independent consultant may

be entitled to privilege as long as the independent consultant was the functional equivalent of an

employee.  *Id*.  While the Eight Circuit looked at several factors to determine that the

independent consultant in *Bieter* was the functional equivalent of an employee, *id.*, it did not

adopt a generalized test for making this determination.  *Id.*

 Since *Bieter*, several courts have grappled with how to determine when an independent

consultant is the functional equivalent of an employee.  Some courts have taken a very narrow

view of which independent consultants may qualify as the functional equivalent of employees.

*See, e.g., Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113-14

(S.D.N.Y. 2005); *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2003 WL 25962198, at *4

(D.N.J. June 25, 2003).  These courts have developed somewhat stringent, multi-factor tests for

determining who qualifies as the functional equivalent of an employee.  *Id.*  For instance, in

*Bristol-Myers*, the court listed the following factors as appropriate to a functional equivalent

determination:

> whether the consultants: 1) were incorporated in the staff to perform a corporate
> function, *which is necessary in the context of actual or anticipated litigation*; (2)
> possessed information needed by attorneys in rendering legal advice; (3)
> possessed authority to make decisions on behalf of the company; and (4) were
> hired because the company lacked sufficient internal resources and/or adequate
> prior experience within the consultant's field.

2003 WL 25962198, at * 4.

 Direct Purchasers advocate that this Court adopt the multi-factor test established in

*Bristol-Myers*, and argue that, under this narrow interpretation of the functional equivalent

doctrine, the Swiftwater Documents are not entitled to attorney-client privilege because

Swiftwater was not the functional equivalent of a GSK employee.  However, this restrictive view

of attorney-client privilege, as it relates to independent consultants, does not comport with the

purpose of privilege as defined in *Upjohn*.   By requiring an independent consultant to possess

the authority to make decisions on behalf of the corporation in order to be the functional

equivalent of an employee, *Bristol-Myers* resurrects the control group test that the Supreme

Court expressly rejected in *Upjohn*.   As the *Bieter* Court recognized, "too narrow a definition of

'representative of the client' will lead to attorneys not being able to confer confidentially with

nonemployees who, due to their relationship to the client, possess the very sort of information

that the privilege envisions flowing most freely."  *Bieter*, 16 F.3d at 938.

Based on the underlying purpose of the attorney-client privilege, several courts have

adopted a broad practical approach to determining whether an independent consultant is the

functional equivalent of an employee.  *See, e.g., U.S. ex rel. Strom v. Scios, Inc.*, No. C05-3004,

2011 WL 4831193, at *4 (N.D. Cal. Oct. 12, 2011) ("[T]he dispositive question is the

consultant's relationship to the company and whether by virtue of that relationship he possesses

information about the company that would assist the company's attorneys in rendering legal

advice."); *U.S. ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-167, 2009 WL

5033940, at *4 (S.D. Ohio Dec. 11, 2009) ("As long as the independent contractor has a role

similar to that of an employee . . . , communications between the contractor and attorneys for the

purpose of seeking legal advice are privileged."); *Stafford Trading, Inc. v. Lovely*, No. 05-4868,

2007 WL 611252, at *7 (N.D. Ill. Feb. 22, 2007) ("The Court adopts this  balanced approach . . .

, limiting the privilege to those instances where . . . [the independent consultant] confidentially

communicated  with . . . counsel for the purpose of obtaining or providing legal advice.").  In

*Federal Trade Commission v. GlaxoSmithKline*, the D.C. Circuit took a practical approach and

held that confidential communications involving consultants were entitled to privilege because they involved the rendering of legal advice and "corporate counsel worked with these consultants in the same manner as they d[id] with full time-employees; . . . acted as part of a team with full-time employees . . . and . . . became integral members of the team assigned to deal with issues [that] . . . were completely intertwined with [GSK's] litigation and legal strategies." 294 F.3d 141, 147-48 (D.C. Cir. 2002) (alteration in original) (internal quotation marks omitted).

The broad approach to determining whether an independent consultant is the functional equivalent of an employee reflects the privilege analysis in *Upjohn* by focusing its inquiry on whether the communications at issue were kept confidential and made for the purpose of obtaining or providing legal advice. *See Trs. of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc.*, 266 F.R.D. 1, 8 (D.D.C. 2010). "In applying the principles set forth by the Supreme Court in *Upjohn*, there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001). Moreover, this approach reflects the reality that "corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 269 (5th ed. 2007). To apply a narrow construction of the privilege to communications involving independent consultants would be "'too restrictive' to be realistic in today's marketplace, where businesses frequently hire contractors and still expect to be able to seek legal advice." *Fry*, 2009 WL 5033940, at *4 n.1.

Lawyers play a valuable role in the corporate setting, "ensur[ing] their client's compliance with the law." *Upjohn*, 449 U.S. at 392. As *Upjohn* explained, the purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* at 389. Based on the principles espoused in *Upjohn*, and the widespread use of independent consultants by corporations, I adopt a broad practical approach to determining whether Swiftwater is the functional equivalent of a GSK employee.

As the record demonstrates, Swiftwater acted as an integrated member of the brand maturation team, which was comprised of full-time GSK employees. Swiftwater played a crucial role in the team, assisting in an administrative, managerial, and analytic capacity. Moreover, Swiftwater was intimately involved in the creation, development, and implementation of the Flonase brand maturation plan. As part of brand maturation strategy, Swiftwater assisted employees on three work streams, including the legal and regulatory work stream. This work touched on several legal and regulatory issues, such as GSK's assertion of intellectual property rights, interaction with the FDA, and application for and receipt of pediatric exclusivity for Flonase. The Swiftwater Documents, produced as a result of Swiftwater's collaboration with GSK employees, were at all times kept confidential and treated as if the attorney-client privilege applied.

The evidence establishes that Swiftwater was the functional equivalent of a GSK employee. However, without looking at the individual documents, it is impossible to know whether each Swiftwater Document was created for the purpose of providing or obtaining legal advice. This analysis must occur before a final determination may be made on the merits of GSK's assertion of privilege over the Swiftwater Documents.

## IV.  CONCLUSION

For the reasons stated above, I hold that Swiftwater is the functional equivalent of a GSK employee.  Thus, as a matter of law, communications involving Swiftwater and GSK's counsel may be entitled to the attorney-client privilege.  However, whether the privilege applies to each communication must be determined on a case-by-case basis under the principles established in *Upjohn*.  In light of this conclusion, I have referred the Swiftwater Documents that remain in dispute to Magistrate Judge Strawbridge for a Report and Recommendation as to which documents should be entitled to the privilege.  This Opinion is consistent with my Order entered on May 3, 2012.  *See* No. 08-3149, ECF No. 333; No. 08-3301, ECF No. 421.


s/Anita B. Brody
_____
ANITA B. BRODY, J.




Copies **VIA ECF** on _____ to:      Copies **MAILED** on _____ to: