## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE FLONASE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

Direct Purchaser Actions

Case No. 08-cv-3149 (Direct)

**Hon. Anita B. Brody**

JUNE 14, 2013                             ANITA B. BRODY, J.

## MEMORANDUM

Following nearly five years of antitrust class action litigation between the makers of branded Flonase nasal spray, the makers of a generic brand version, indirect purchasers of the drug, and direct purchasers, the parties reached a global settlement in January 2013. Before me now is the Direct Purchaser Plaintiffs' ("DPs") Corrected Motion for Approval of Settlement (Doc. 488) and Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs (Doc. 486). After holding a fairness hearing on June 3, 203 and reviewing the Plaintiffs' submissions, I now approve the final settlement agreement and allocation plan. I will also grant counsel's request for attorneys' fees, reimbursement of expenses, and incentive awards for class representative, although I will modify the incentive payment awarded.

## I.     BACKGROUND

Named plaintiffs American Sales Company, Inc., Meijer, Inc., and Meijer Distribution, Inc. brought this suit on behalf of a class of 33 companies that purchase medications directly from the manufacturer—in this case, purchasers of Flonase, the brand-name version of fluticasone propionate ("FP"), a nasal corticosteroid used to treat

nasal inflammation caused by allergies. The suit claimed that Defendant SmithKline
Beecham Corporation d/b/a GlaxoSmithKline PLC ("GSK") improperly delayed the
entry of generic FP, resulting in overcharges to the direct purchasers. Plaintiffs allege that
this allowed GSK to unlawfully maintain monopoly power in the American FP market;
maintain the price of Flonase at above-competitive levels; and overcharge the direct
purchasers millions of dollars by blocking unrestricted competition and access to less
expensive generic versions of FP.

    This case has an extensive litigation history. American Sales filed the first
complaint against GSK for its anticompetitive behavior in 2008.[1] Extensive discovery
began in late 2008 and continued through mid-2010, including 30 depositions of current
and former employees of GSK and Roxane Laboratories ("Roxane"), the maker of
generic FP. Over a dozen expert reports and rebuttals were submitted. After oral
argument, I certified a class of 33 direct purchasers of Flonase on November 12, 2010.
*See American Sales Company, Inc. v. Smithkline Beecham Corp.*, 274 F.R.D. 127 (E.D.
Pa. 2010).[2] In 2011, I denied two separate GSK motions for summary judgment, one on
causation, and one on *Noerr-Pennington* immunity. *See* 798 F.Supp.2d 619 (E.D. Pa.
2011) and 795 F.Supp.2d 300 (E.D. Pa. 2011), respectively. The case was set for trial in
early 2013, and both sides submitted over a dozen motions *in limine*. With the court's
assistance, the parties reached a settlement agreement in November 2012, whereby GSK
agreed to pay $150 million in exchange for the settlement of all direct purchaser claims. I
preliminarily approved the settlement on January 14, 2013.

## II.    FINAL APPROVAL OF SETTLEMENT

---

[1] Related cases were also filed by indirect purchasers of the drug (No. 08-3301) and Roxane Laboraties
("Roxane") (No. 09-1638), the maker of a generic competitor to Flonase.
[2] After notice went out, there was not a single objector or exclusion from the class certification.

According to Federal Rule of Civil Procedure 23(e), "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In other words, "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.' " *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 316 (3d Cir.1998) (quoting *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995)).

The Third Circuit applies a nine prong test, known as the *Girsh* factors, when determining the fairness, adequacy, and reasonableness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (internal quotation marks and ellipses omitted). In more recent decisions, the Third Circuit has suggested an expansion of the nine-prong test when appropriate to include what are now referred to as *Prudential* considerations, such as:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for *335 individual class or subclass members and the results achieved-or likely to be achieved-for

3

other claimants; whether class or subclass members are accorded the right
to opt out of the settlement; whether any provisions for attorneys' fees are
reasonable; and whether the procedure for processing individual claims
under the settlement is fair and reasonable.

*In re Prudential*, 148 F.3d at 323; *see also In re Pet Food Prods. Liab. Litig.,* 629 F.3d

333, 350 (3d Cir.2010). District courts "must make findings as to each of the Girsh

factors, and the *Prudential* factors where appropriate," and "cannot substitute the parties'

assurances or conclusory statements for [their] independent analysis of the settlement

terms." *In re Pet Food*. 629 F.3d at 350–51.

Here, the Girsh factors and relevant Prudential considerations weigh in favor of

settlement approval.

**A.  The Complexity, Expense, and Likely Duration of the Litigation**

This suit involves highly complex antitrust issues, FDA bioequivalence standards

for suspension nasal spray products, pharmaceutical manufacturing and supply issues,

and pharmaceutical regulatory issues, all of which were investigated and litigated for

more than four years. Antitrust class actions are particularly complex to litigate and

therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig*., 2008 U.S.

Dist. LEXIS 569, at *14 (E.D.Pa. Jan. 3, 2009) ("This litigation, like most antitrust cases,

has been exceedingly complex, expensive, and lengthy.") (emphasis added). " 'An

antitrust class action is arguably the most complex action to prosecute. . . .' " *In re

Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (quoting *In re

Motorsports Merchandise Antitrust Litig.*, 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000)).

The DPs and GSK reached this settlement after they had completed significant

preparation for trial, including litigating *Daubert* challenges, identifying hundreds of trial

exhibits, and briefing over a dozen motions *in limine* between them. The settlement

avoided the need for a difficult and expensive multi-week trial involving complex scientific and regulatory testimony, and the time and expense associated with the appeal that would likely have followed a verdict. This factor strongly supports settlement.

### B.  The Reaction of the Class to the Settlement

All 33 class members received direct notice, via first-class mail, of the class settlement. There has not been a single objection. Moreover, two of the three largest pharmaceutical distributors in the country—class members whose claims collectively represent the majority of the total recovery—have submitted letters affirmatively supporting the settlement. This factor overwhelmingly supports settlement approval.

### C.  The Stage of the Proceedings and the Amount of Discovery Completed

These proceedings advanced to a sufficiently late stage prior to settlement that the related *Girsh* and *Prudential* factors also weigh in favor of approval. Explaining the rationale behind the third *Girsh* factor, the Third Circuit wrote in *Prudential*:

> The parties must have an "adequate appreciation of the merits of the case before negotiating." To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken.

*In re Prudential*, 148 F.3d at 319 (quoting *In re G.M.,* 55 F.3d at 813). Further, "courts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000).

This factor also weighs strongly in favor of approval of the settlement agreement. This case was very advanced by the time the agreement was reached. Fact discovery concluded in February 2010 and included 45 depositions and millions of pages of documents. Expert discovery concluded in September 2010 and included the exchange of

numerous expert reports. The parties briefed two separate motions for summary judgment. The Court heard *Daubert* motions concerning experts on both sides on two separate occasions. By the time the agreement was reached, the parties had exchanged trial witness lists, conferred on trial exhibits and deposition testimony to be used at trial, and submitted pretrial memoranda. Trial was just two months away when the parties reached their agreement.

### D.  The Risks of Establishing Liability and Damages.

These two *Girsh* factors are closely related, so I will address them together. This case involved complex scientific, regulatory, and legal issues, and plaintiffs faced many obstacles to success at trial. Among other things the Plaintiff would have to prove were two particularly difficult propositions: First, they would have had to prove that GSK's petitions to the FDA regarding generic FP were objectively baseless and that GSK could not have reasonably expected success on the merits of any of its requests to the FDA. Second, and most crucially, Plaintiffs would have had to prove that GKS's petitions to the FDA were a substantial cause of any delay in the approval of Roxane's generic FP, and that, but for GSK's actions, Roxane would have had the manufacturing capability to get its product to market sooner. These difficulties go both to Plaintiffs' case for liability and their case for damages, as they would have had to show that GSK's actions resulted in improper overcharges to the DPs. Given the complexity of these issues, there is no guarantee that a jury would have found GSK liable, or how the jury would have responded to the complicated economic data necessary to show damages. Therefore, these two factors counsel in favor of settlement.

**E.  The Risks of Maintaining the Class Action Through Trial**

Although I already certified the DP class here, class certification is subject to review and modification at any time during the litigation. *See Zenith Lab., Inc. v. Carter–Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir.1976). However, numerous courts, including the Third Circuit, have certified nearly identical classes of direct purchasers bringing antitrust claims against manufacturers allegedly seeking to delay generic competition in the pharmaceutical industry. *See, e.g., In re K-Dur Antitrust Litig*., 686 F.3d 197 (3d Cir. 2012); *In re Wellbutrin SR Direct Purchaser Antitrust Litig*, C.A. No. 05-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008); *Teva Pharms. USA, Inc. v. Abbott Labs,* 252 F.R.D. 213 (D. Del. 2008). Because Plaintiffs do not face much risk in maintaining a certified class throughout trial, this factor is neutral.

**F.  The Ability of the Defendants to Withstand a Greater Judgment**

This factor is also neutral. The ability of defendants to withstand a greater judgment generally only comes into play when "a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp*., 761 F.Supp.2d 241, 254 (E.D.Pa.2011). That does not appear to be the case. I have not been presented with any evidence indicating that GSK is at risk of insolvency. Regardless, I follow my district court colleagues within the Third Circuit who "regularly find a settlement to be fair even though the defendant has the practical ability to pay greater amounts." *Bredbenner v. Liberty Travel, Inc*., 2011 WL 1344745, at *15, 2011 U.S. Dist. LEXIS 38663, at *42 (D.N.J. Apr. 8, 2011) (citing *McCoy v. Health Net. Inc*., 569 F.Supp.2d 448, 462 (D.N.J.2008); *Weber v. Gov't*

*Emples. Ins. Co.*, 262 F.R.D. 431, 446 (D.N.J.2009)). Therefore, this *Girsh* factor neither

supports nor undercuts the parties' settlement.

**G. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

Taken together, the final two *Girsh* factors "test two sides of the same coin:

reasonableness in light of the best possible recovery and reasonableness in light of the

risks the parties would face if the case went to trial." *In re Warfarin Sodium Antitrust*

*Litig.*, 391 F.3d 516, 538 (3d Cir. 2004). These factors confirm that the settlement here

should be approved. A proposed settlement totaling $150 million cash is reasonable both

in absolute terms and in light of the circumstances of this litigation, particularly the risks

of establishing liability at trial. Under the settlement, each class member can benefit from

the $150 million fund immediately, and avoid the uncertainties and delay inherent in

continuing to litigate this complex class action.

In *In re G.M. Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, the Third Circuit

warned "against demanding too large a settlement ... after all, settlement is a compromise,

yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d 768, 806

(3d Cir.1995). With that warning in mind, I agree with class counsel and find that the

$150,000,000 figure is reasonable. Therefore, this factor weighs in favor of settlement.

**H. *Prudential* Factors**

In *Prudential*, the Third Circuit noted that, "since *Girsh* was decided in 1975,  there

has been a sea-change in the nature of class actions," noting that it therefore "may be

useful to expand the traditional *Girsh* factors" to add additional topics for the district

courts to take into consideration when reviewing a proposed settlement agreement. *In re:*

*Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283 (3d Cir.1998). Here, the

relevant *Prudential* factors counsel in favor of approving the settlement. First, as has been explained above, the case was settled only after extensive discovery and trial preparation. The underlying substantive issues were therefore well-developed, supporting approval of the settlement. Second, as to the results achieved for the individual class members compared to those achieved for other claimants, there are no direct purchaser class members who have filed a separate lawsuit against GSK. Therefore, the settlement creates the only award for class members. Third, class members were given the chance to opt out when I originally certified the class in 2010. No class member requested exclusion. While I declined to allow class members an additional opportunity to opt out of the class after receiving notice of the settlement, not a single class member objected to the settlement for any reason, including on the basis that no opt-out right was given. Therefore, the absence of a second opt-out right was of no consequence here. As to attorneys' fees, as I will discuss in the next section, the provisions for attorneys' fees are reasonable. Sixth, the procedure for processing individual claims under the settlement is fair and reasonable. Class members will be provided with information reflecting their qualifying purchases, as reflected in GSK's sales records, and will be advised of their proposed *pro rata* share of the total purchases. They will have the opportunity to review the information based on their own data. Once all claims have been submitted, payments will be distributed based on each class member's pro rata share of the purchases, so that if one direct purchaser made 10 percent of the purchases, it will receive 10 percent of the settlement fund.

The *Girsh* factors and the *Prudential* factors all counsel strongly in favor of approval of the class settlement. I therefore find the settlement to be fair, reasonable, and adequate.

### III.    ATTORNEYS' FEES AND EXPENSES

Class counsel seeks (i) an award of attorneys' fees in the amount of $50 million, or one-third of the $150 million settlement fund (plus interest); (ii) reimbursement for litigation costs and expenses totaling $2,069,433; and (iii) approval of an incentive award to class representatives American Sales and Meijer in the amount of $85,000 and $75,000, respectively. Doc. No. 486.

Federal Rule of Civil Procedure 23(h) states: "In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." The proposed settlement agreement states class counsel's intention to seek attorneys' fees of up to 33 1/3 percent of the total settlement fund, along with reimbursement of reasonable costs and expenses incurred, all of which will be paid directly from the settlement fund. Settlement Agreement ¶ 9, Mot. for Preliminary Approval of Settlement Ex. A, Doc. No. 480-2. Nonetheless, "a thorough judicial review of fee applications is required in all class action settlements." *In re Prudential,* 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819).

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method. *In re Prudential,* 148 F.3d at 333. The former is "more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* The latter method, on the other hand, is "generally favored in cases involving a common fund . . . ." *Id.* Either way, "it is sensible for a court

to use a second method of fee approval to cross-check its initial fee calculation." *In re Rite Aid Corp. Sec. Litig*, 396 F.3d 294, 300 (3d Cir. 2005).

### A.  Applying the *Gunter* Factors

The settlement agreement at issue here establishes a common fund of $150 million, from which the class members will receive their allocations and the attorneys will receive any award and expense reimbursement. "[I]n the traditional common fund situation ... the district court ... should attempt to establish a percentage fee arrangement agreeable to the Bench and plaintiff's counsel." *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985). In order to make that determination, the Third Circuit has identified ten factors for the Bench to consider. These include:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir.2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000); *In re Prudential*, 148 F.3d at 336–40). These *Gunter/ Prudential* factors are not exhaustive, and a district court should consider "'any other factors that are useful and relevant with respect to the particular facts of the case.'" *In re Diet Drugs*, 582 F.3d at 541 n. 34 (quoting *In re AT & T Corp. Sec. Litig.*, 455 F.3d 160, 166 (3d Cir.2006)).

**1.   The size of the fund created and the number of beneficiaries**

The settlement creates a $150 million settlement fund. Each of the 33 direct

purchaser class members will receive a *pro rata* share based on their purchases of

Flonase from the net fund, after attorneys' fees, expenses, and incentive awards, plus

accrued interest, are removed. This is a sizeable settlement, and provides immediate and

certain payment to the class members. Every dollar of the net fund will be distributed to

class members. This factor counsels in favor of approval of the requested fee.

**2.   The presence or absence of substantial objections by members of the
class to the settlement terms and/or fees requested by counsel**

As discussed above, there are no objections by any class members to this

settlement. This factor strongly supports approval of the requested fee.

**3.   The skill and efficiency of the attorneys involved**

The Third Circuit has explained that the goal of the percentage fee-award

device is to ensure "that competent counsel continue to undertake risky, complex,

and novel litigation." Id. at 198. The *Cullen* court explained that "[t]he single

clearest factor reflecting the quality of class counsels' services to the class are the

results obtained." *Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 149 (E.D.

Pa. 2000).

Thomas Sobol of Hagens Berman Sobol Shapiro LLC and Joseph Meltzer

of Kessler Topaz Meltzer & Check, LLP were co-lead counsel for the direct

purchasers in this case. Both firms have extensive experience in plaintiff-side

class action, with particular expertise in delayed generic entry cases. Indeed,

counsel for both sides were knowledgeable, tenacious, and highly skillful. As

discussed above, the $150 million settlement award represents a substantial

amount and clearly demonstrates the value of class counsel's efforts. This factor supports approval of the requested fee.

### 4. The complexity and duration of the litigation

I have already addressed this matter above in my discussion of the *Girsh* factors. This factor weighs strongly in favor of the proposed fee.

### 5. The risk of nonpayment

The risk of nonpayment here was not negligible. As explained above in analyzing the risks of establishing liability under the *Girsh* analysis, success in this litigation was by no means guaranteed. *See In re Rite Aid*, 396 F.3d at 304 (finding the "risks of establishing liability" analysis relevant to the assessment of the risk of non-recovery). Even if Plaintiffs had succeeded in proving liability at trial, there is no guarantee they would have recovered damages. *See, e.g., U.S. Football League v. National Football League*, 644 F.Supp. 1040, 1042 (S.D.N.Y. 1986) (noting the jury's award of only $1 in nominal damages to the plaintiffs). Moreover, as a contingent fee case, counsel faced a risk of nonpayment in the event of an unsuccessful trial. This factor supports approval of the requested fee.

### 6. The amount of time devoted to the case by plaintiffs' counsel

According to their declaration, class counsel spent more than 40,000 hours over the course of more than four years litigating this case. More than 35,000 hours were logged by the two lead counsel firms alone. The record of this litigation also indicates that the time spent by Plaintiffs' counsel was necessary for the successful prosecution of this case, considering both the complexity of the

issues and the robust defense mounted by the defendants. This factor weighs in favor of the requested fee.

### 7. The awards in similar cases

The fee request here is consistent with other direct purchaser class actions involving allegations of overcharges arising from suppressed generic drug competition. Just last year, for example, this court approved a one-third attorneys' fee from one such case with a $37.5 million settlement fund. Final Order and Judgment Approving Settlement at 8, *In re Wellbutrin XL Antitrust Litigation*, No. 08-2431 (E.D. Pa. Nov. 7, 2012). Indeed, in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees. *In re Wellbutrin, id.*; *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142-SLR (D. Del. May 31, 2012) (awarding fees of one-third of $17.5 million settlement fund); *In re Metoprolol Succinate Antitrust Litig.*, No. 06-52-MPT (D. Del. January 12, 2012); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011); *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. November 21, 2011); *Meijer, Inc. v. Abbott Labs.*, No. 07-05985-CW (N.D. Cal. Aug. 11, 2011); *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011); *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011).

It is also important to emphasize that every single class member received direct notice of the settlement agreement, including counsel's intention to request a one-third fee, and not a single class member objected. What is more, two of the three largest pharmaceutical distributors in the country, whose claims collectively

14

represent more than half of the total recovery, have expressly indicated their support of the settlement.[3] This factor supports approving the requested fee.

### 8.   The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations

Class counsel was not assisted by a government investigation. In *Prudential*, the Third Circuit singled this factor out for important consideration by district courts. *See In re Prudential*, 148 F.3d at 338. The appeals court remanded the trial court's fee award for wrongly "credit[ing] class counsel with creating the entire value of the settlement" and overlooking the considerable contributions of a multi-state life insurance task force. *Id*. Yet this case is more similar to *In re AT & T*, in which the Third Circuit found that "class counsel was not aided by the efforts of any governmental group, and the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel." *In re AT & T*, 455 F.3d at 173. Although other plaintiffs pursued claims against GSK, counsel for the direct purchaser plaintiffs launched the first action and led joint litigation efforts, taking the lead in discovery and development of scientific and FDA experts, significant motion practice, and trial preparation. This factor weighs in favor of the proposed fee.

### 9.   The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained

---

[3] *See* Corrected Decl. of Co-Lead Counsel Thomas M. Sobol and Joseph H. Meltzer in Support of Direct Purchaser Plaintiffs' Unopposed Motion for Final Approval of Settlement Ex. B. ("CardinalHealth is satisfied that . . . the proposed attorneys' fee award of one-third of the settlement amount is appropriate in this case"); Ex. C ("McKesson . . . supports class counsel's application for attorneys' fees and reimbursement of costs").

It is extremely difficult to determine what fee would have been negotiated at the outset of the litigation. I can only look to my colleagues who have attempted to apply this factor, even though I recognize that the contingent fee can only be "based on the particular facts and circumstances of the specific litigation under consideration." *In re United States Bioscience Sec. Litig.*, 155 F.R.D. 116, 119 (E.D.Pa.1994). After appointing a Special Master to study the award of attorneys' fees in a class action securities suit, Judge Dalzell approved of the Special Master's recommendation that a thirty percent fee award was an appropriate estimate of what would have been negotiated. *See id.* (citing Report and Recommendation of Special Master Judge Arlin M. Adams). Judge Katz noted that in private contingency fee cases, "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." *In re Ikon*, 194 F.R.D. at 194. Of course, Judge Katz was referring to tort matters in particular. In the end, I do "not give great weight to this hypothetical exercise." *In re Prudential*, 148 F.3d at 340. This factor is neutral and will not be considered to count for or against the proposed fee request.

### 10. Any innovative terms of settlement.

The terms of this settlement are relatively standard. In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

### 11. Summation

I recognize that the *Gunter/Prudential* factors "'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" *In re AT & T*, 455 F.3d at 166 (citing *In re Rite Aid*. 396 F.3d at 301). In sum, after

"'engag[ing] in a robust assessment [ ] of the fee award reasonableness factors,'" I have determined that eight of the ten *Gunter*/*Prudential* factors count in favor, while the remaining two are neutral. *Id*. (citing *In re Rite Aid*, 396 F.3d at 302). Therefore, there is overwhelming support for the proposed fee. The lodestar cross-check, moreover, militates in favor of approval.

### B.  Lodestar

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *In re Rite Aid*, 396 F.3d at 305. Once the lodestar is calculated, "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases." Manual for Complex Litigation (Fourth) § 14.122 (2004).

### 1.  Number of Hours and Hourly Rates

Class counsel reports that they cumulatively spent more than 41,000 hours litigating this case over the last nearly five years. Seven different firms worked on the Plaintiffs' case, though the vast majority of hours were logged by the two lead counsel firms, Hagens Berman Sobol Shapiro LLC and Kessler Topaz Meltzer & Check LLP. At my request, class counsel submitted copies of their time and expense records for in camera review. The nearly five years of work included, among other work, preparing the complaint; conducting extensive discovery including taking 39 depositions of current and former employees of GSK and Roxane; filing for class certification; submitting 13 opening and rebuttal expert reports; opening and defending *Daubert* challenges; defending

two separate motions for summary judgment; and preparing for trial, including filing eight motions *in limine* and defending against eight motions *in limine*. The law firms charged different amounts based on their average billable rates and the individual attorney or staff member working on the assignment, with hourly rates ranging from $120 to $795.

Taking the reported hours at the attorneys' current rate reveals a lodestar of $18,616,424. Counsel explained in their briefing that, after reviewing the reported hours, they revised the lodestar downward to delete unnecessary duplication of effort, mis-reported time, and other errors, and came up with a lodestar that "exceeds $16,750,000." Under the revised figure, the average billable rate is $407 per hour.

### 2. Lodestar Multiplier

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 539 (3d Cir.2009) (citing *In re Rite Aid*, 396 F.3d at 305–06). The Third Circuit explained that "multipliers may reflect the risks of non-recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for extraordinary result. By nature they are discretionary and not susceptible to objective calculation." *In re Prudential*, 148 F.3d at 340. The lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($50,000,000.00) by the total amount of hours class counsel devoted to the litigation times class counsel's hourly rates ($16,750,000). Here, that calculation comes to a multiplier of 2.99, meaning class counsel would receive nearly three times their regular billing rates. The Third Circuit has recognized that "'multiples ranging from one to four are frequently awarded

in common fund cases when the lodestar method is applied.'" *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (2000) Brody, J.) (internal quotation omitted). *See also In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir.2001) (citing *In re Prudential*, 148 F.3d at 341). Indeed, courts in this circuit have accepted multipliers much higher than the one here. *See, e.g., Meijer, Inc. v. 3M,* No. 04-5871, 2006 WL 2382718 at *24 (E.D. Pa. Aug. 14, 2006) (approving a percentage fee award that translated to a 4.77 multiplier); Order and Final Judgment Approving Settlement, Awarding Attorneys' Fees and Expenses, Awarding Representative Plaintiff Incentive Awards, Approving Plan of Allocation, and Ordering Dismissal As to All Defendants, *In re Tricor Direct Purchaser Antit. Litig.*, No. 05-340 at 9 (D. Del. Apr. 23, 2009) (approving a one-third fee where lodestar multiplier was 3.93).

Therefore, a multiple of 2.99 is within the generally acceptable range and provides additional support for approving the attorneys' fees request. Thus I will award counsel thirty-three and a third percent of the common fund, for a total of $50,000,000.00, in attorneys' fees.

### C.  Costs

Class counsel requests reimbursement of $2,069,433 for expenses incurred litigating the case. Two-thirds of this amount reflects fees paid experts, including to pharmaceutical science experts, FDA regulatory specialists, and economic experts, all of whom were integral to the Plaintiffs' prosecution of the case. The next largest category of expenses, what class counsel calls "document management," represents less than ten percent of the total costs. As class counsel notes, they had a strong incentive to conserve their expenses, given that they were incurred with no guarantee of recovery. I find that

these expenses were reasonable and proper. Therefore, I will award counsel a reimbursement of these expenses from the settlement fund.

### IV.    Incentive Awards for Class Representatives

Incentive awards are "not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class." *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997). As a matter of practice, "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Id*. (citing numerous cases in which incentive awards were granted). I agree with my colleagues who have held that "[r]easonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation." *First State Orthopaedics v. Concentra. Inc*., 534 F.Supp.2d 500, 524–25 (E.D. Pa.2007) (referencing *Nichols v. SmithKline Beecham Corp*., No. 00-6222, 2005 WL 950616, at *24 (E.D. Pa. April 22, 2005); *Godshall v. Franklin Mint Co.*, No. 01-6539, 2004 WL 2745890 (E.D. Pa. Dec. 1, 2004,)).

Plaintiffs seek an incentive award for the two class representatives, American Sales and Meijer, in the amount of $85,000 and $75,000, respectively. Though incentive awards are appropriate in this case, the requested amounts are too large. I will award American Sales $50,000 and Meijer $40,000.

These class representatives launched this litigation despite the risk of retaliation inherent in suing a supplier. This risk should be recognized. The class representatives "actively assisted in the preparation and prosecution of the case by collecting and producing records, preparing for and giving depositions and agreeing to participate in

what could have been a several-week trial, turning attention away from their daily business." Pls.' Mot. for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs, Sobol and Meltzer Decl., at ¶ 16. The $10,000 difference in the requested award reflects the fact that American Sales filed the first complaint, and maintained the action for nearly a year before Meijer filed its own action.

Finally, an incentive award of $50,000 and $40,000 is within the range of payments awarded by courts within the Third Circuit in other direct purchaser antitrust litigation. *See, e.g.*, *Tricor*, No. 05-340 at 11 (D. Del. Apr. 23, 2009) (awarding $50,000 to each of three class representatives); *Bradburn Parent Teacher Store*, 513 F.Supp.2d 322, 342 (awarding $75,000 to one class representative); *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448, 480 (awarding $60,000 to each class representative).

### V.     Plan of Distribution and Proposed Claim Form

When assessing proposed plans of allocation, courts use the same standard for determining whether to approve the settlement itself. Therefore, the proposed plan needs to be fair, reasonable and adequate. *In re Cendant Corp. Litig*., 264 F.3d 201, 248 (3d Cir.2001). "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." I*n re Ikon Office Solutions, Inc. Sec. Litig*., 194 F.R.D. 166, 184 (E.D.Pa.2000). The plan of distribution, which was submitted with the Plaintiffs' memorandum in support of its motion for preliminary approval of the settlement (Doc. No. 480-1, at Ex. B), meets this standard. Under the plan proposed by Plaintiffs, as revised in their current motion, the claims administrator will mail claim forms to every class member within five days of final approval of the settlement. This

form will include calculations made by the settlement administrator of each class member's qualifying Flonase purchases during the class period, based on GKS's sales data. Class members have thirty-five days after final approval to submit their executed claim forms, in which they either accept the administrator's calculations or provide their own Flonase purchase data to support a revised purchase amount. By sixty-five days after final approval, class counsel will submit to the court a motion for distribution of the net settlement fund supported by a declaration of the settlement administrator. Under this plan, each class member receives their *pro rata* share of the net settlement fund, based on their share of qualifying Flonase purchases.

I find that the proposed plan is fair, reasonable, and adequate, especially as claimants are expected to receive the maximum amount they would have received if they had opted for trial and won. I also find that the proposed claim form is clear, fair, and reasonable.

**VI.    Conclusion**

For the reasons explained above, I will grant Plaintiff's Motion for Final Approval of Settlement and their Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Incentive Awards to the Representative Plaintiffs.


                                                    s/Anita B. Brody

Dated: _____6/14/2013_____          _____

                                                    ANITA B. BRODY, J.